**E. J. BRACH & SONS**

**v.**

**UNITED STATES.**

**R.D. 11721; Reappraisement R66/5989.**

United States Customs Court.
Aug. 26, 1970.

---

Schwartz & Lidstrom, Chicago, Ill. (Barnes, Richardson & Colburn, New York City, Joseph Schwartz, Chicago, Ill., of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Velta A. Melnbrencis, Trial Atty., New York City), for defendant.

RICHARDSON, Judge:

The merchandise the subject of this reappraisment appeal consists of certain waxed, metal covered paper which was imported in rolls by plaintiff from Holland for use in wrapping candies manu-

factured by it in this country. The paper is described on the invoice as "FW402GS OP–2 sides waxed bleached opaque GIP. 40 grs/sqm. Paper printed 1 colour and provided with aluminum centrestrip 1″ wide printed in 3 colours and coloured foil twistends ⅜″ wide. Rolls: 3½″ x 3″ x 9½″,'' was manufactured by Cats-Neparofa of Holland, and was exported from that country on November 26, 1965.

It appears from the record that the merchandise was entered at $1,310 U. S. dollars per 2000 pounds; and that it was appraised on the basis of foreign value as defined in 19 U.S.C.A., section 1402 (c) (section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at Dutch florins 5351.-30 per 2000 pounds net, plus the cost of export packing in the amount of $122 U. S. dollars. Plaintiff contends that there is no foreign, export, or United States value for the merchandise, and that, therefore, the merchandise must be appraised as entered on the basis of cost of production value. Plaintiff's basic argument is that the imported paper and paper sold to others are imprinted with the purchasers' designs and insignia and are, therefore, not commercially interchangeable. Defendant contends that the merchandise was properly appraised on the basis of its foreign value, defendant's argument being that despite the specific color, design, or printing which is placed on the paper at the purchasers' order, the paper purchased by each purchaser is, nevertheless, similar to the paper purchased by any other purchaser. No question is raised about the fact that the merchandise at bar is on the final list promulgated by the Secretary of the Treasury.

With a view toward negativing the existence of foreign, export and United States values for the imported paper and supporting the claimed cost of production value therefor, plaintiff introduced into evidence at the trial, among other things, an affidavit of M. A. van Dongen dated September 19, 1968 (exhibit 1), export manager of Cats-Neparofa, the manu-facturer and exporter of the involved paper. After stating his qualification on the matter of knowledge of his company's export and home market policies the van Dongen affidavit states on the subject of home and export markets:

5. The merchandise covered by invoice No. 9796 consisted of waxed bleached paper printed 1 color and covered with aluminium [sic] centrestrip 1″ wide printed in 3 colors and colored foil twist ends ⅜″ wide, in rolls 3½″ x 3″ x 9½″.

   This shipment as is the case with all shipments to E. J. Brach & Sons, was specially ordered and manufactured to suit their requirements for candy wrappers. By this I mean that the paper was manufactured in the sizes needed by E. J. Brach & Sons for their candy; the design, and the colors and the style of printing were specified by E. J. Brach & Sons; and the paper was also imprinted with the name "Brach's" as well as various flavours as specified by E. J. Brach & Sons and as described on invoice No. 9796.

6. As export manager I also have personal knowledge of class or kind of paper which Cats-Neparofa has sold and sells to other candy manufacturers in the United States and Holland and other countries. All of these customers send us specifications for the kind of paper which they want, and design of the printing, and the names of candy flavours to be imprinted; and the paper is also imprinted with the name of each candy manufacturer. Each order is specially manufactured to the design and specifications of each customer, and this has always been true.

7. There are attached to this affidavit several samples of the papers which my company manufactures for typical customers who are candy manufacturers in Holland, the United States, and other countries.

8. The selling prices of the paper which Cats-Neparofa sells to candy manufacturers depends upon a number of factors including the quality, the width, the number of colors to be printed, and the widths of the metal foil, and this has always been the case.

9. Sine [sic] each order is specially manufactured for a particular candy manufacturer, the papers ordered by any candy manufacturer cannot be shipped to fill an order of any other customers; paper which is imprinted with the name of one candy manufacturer would be useless to anyone else; and this has always been so.

And the van Dongen affidavit, after stating the affiant's qualifications for knowing the selling practices and policies of his company's competitors in Holland, who are identified as being SUPERIEUR Verpakkingen N.V., ETTEN-LEUR and PAPIER METAAL N.V., ZUTPHEN, goes on to state:

11. I have seen samples of the candy wrapper papers made by the above companies. From the samples and from my knowledge of their business, I declare that the candy wrapper papers produced by these companies are specially made to order for their customers, and imprinted with the names and designs of their customers; and that these companies have never offered or sold any goods to E. J. Brach & Sons; and all of these facts have been true since at least the year 1961.

Plaintiff also introduced into evidence as exhibit 3 the affidavit of J. C. van Bussel dated September 19, 1968, domestic sales manager of Cats-Neparofa. The van Bussel affidavit corroborates the statements made in paragraphs 6, 8, 9 and 11 of the van Dongen affidavit as noted herein.

And plaintiff called as a witness one Harold L. Preston, assistant director of purchasing for E. J. Brach & Sons, a candy manufacturer and the plaintiff herein. Mr. Preston testified in connection with the purchase of the instant merchandise from Cats-Neparofa, with whom plaintiff commenced doing business in 1959. Through this witness it was established that the involved importations came in on 3½" wide rolls, with a 9½" outside diameter, on 3" wooden spools packed six rolls to a case, had a center strip of foil and end strips of foil, possessed definite specifications as to thickness, composition, water content, wax coating and yield per pound, art work, printing and colors, and had to withstand a certain amount of twisting. The witness testified that in application the paper is put on a Fargrove machine in rolls and threaded so that it will meet the candy as it is coming from a cutting device—little metal twisting fingers causing the ends of the paper to twist and the candy to be sealed within the cut-off piece of wrapping paper.

Mr. Preston referred to a sample of the imported papers which was put in evidence as exhibit 4 as being similar to those manufactured for other companies around the world (R. 17). And in his concluding testimony given on cross-examination, Mr. Preston testified (R. 31–32):

Q. You indicated that the price had not varied?—A. No ma'am, not to my recollection. We have had, maybe it is five years ago we had a price increase, four or five years ago. I would have to check my records.

Q. Isn't it true that the price depends in part on the number of colors used in the paper?—A. Oh, yes ma'am. Perhaps I misunderstood you. The number of colors are stable, standard that is, and therefore from run to run, the price is constant for that color range. Perhaps I misunderstood you.

Q. Thus in pricing, what determines the price is the number of colors, and the type of foil used?—A. The foil, the number of colors, the width of the material, these are important factors.

Q. Not the design itself?—A. No, I wouldn't think so, no.

Q. Thus in fact, you would say that wrapping for lemon flavor costs the same as for raspberry flavor?—A. Yes ma'am, it does.

There was other evidence presented by plaintiff bearing on the residual cost of production basis of valuation. However, the foregoing constitutes the salient evidence adduced by plaintiff bearing on the market value bases of appraisement.

Defendant offered both testimonial and documentary evidence in support of the appraised values. Norman E. Glowienke, a buyer of packaging materials for Kraft Foods, a Division of National Dairy Products Corporation, testified that since 1964 Kraft Foods has purchased some of its candy wrapping paper from Cats-Neparofa (R. 40). The witness stated that as far as he knew the specifications for the paper purchased from Cats-Neparofa had not changed since 1964, that the design used on the paper is a Kraft design for the printing of which Kraft incurs a printing charge (R. 40), and that Cats-Neparofa invoices Kraft for the paper on a per pound basis (R. 41). Mr. Glowienke also identified the papers from a Kraft customs entry dated November 23, 1964, covering a shipment of paper from Cats-Neparofa to Kraft Foods, which papers were received in evidence as collective exhibit F. The merchandise is described on the commercial invoice included among said papers as "FW402GS OP.=2-sides waxed bleached op. GIP. s/o.23.61 lbs. Rolls 3½″ x 3″ x 9½″. Paper fully coloured and provided with alum. centre-strip 1⅛″ wide printed in 3 colours and alum. borderstrips ⅜″ wide fully coloured and printed in one colour", and shows a per pound price in United States money of $0.76 for a total net pounds of 2,080.04.

Albin F. Anderson, Kraft Food's transportation specialist testified that part of his responsibilities entails the handling of papers connected with export-import transactions, that he receives and reviews invoices and sends them on to Kraft's division in Kendallville, Indiana, where they are approved for payment and returned to his division for payment, and that in the case of Cats-Neparofa payments are remitted to it in Rotterdam (R. 47).

Defendant also introduced into evidence as exhibit B a report of Customs Representative Viktor Jacobson, dated January 7, 1965, relating to an investigation of Cats-Neparofa in December, 1964, on the subject of export and foreign values of metal covered paper manufactured and sold by Cats-Neparofa of Rotterdam, Holland. The report is based upon an interview Jacobson had with Mr. Daane, Cats-Neparofa's assistant export manager, and upon confirmation obtained from company business records. On the subject of foreign value the report states that merchandise identical to that exported to the United States, except for design, is freely offered and sold to all users in Holland, that the merchandise is sold in the home market by salaried sales representatives or directly at the factory, and is sold *free customers' premises*. A price list for the home market is attached to the report as exhibit E. A revised home market price list, reflecting an increase in prices, and received in evidence as part of exhibit C, is the subject of a transmitting report of Customs Representative Jacobson under date of November 9, 1965, to the appraiser at New York.

■■ Since appraisement of the merchandise herein was based upon foreign value, it is incumbent upon plaintiff to eliminate the existence of a foreign value for the merchandise at bar before undertaking to establish another value therefor. 19 U.S.C.A., section 1402(a). And in meeting this burden of proof plaintiff is confronted with the presumption that the appraiser found to exist every fact necessary to support the existence of a foreign value for either *such* or *similar* merchandise. United States v. Machado & Co., 6 Cust.Ct. 802, Reap.Dec. 5131 (1941).

The court turns first to the matter of foreign value, the provisions of which are contained in 19 U.S.C.A., section 1402 (c) (section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). Such value is defined as:

(c) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

[3] The issue presented under this basis of value is whether the imported paper is "such" as or "similar" to the paper offered for sale by Cats-Neparofa in the home market. "Such" merchandise means *identical* goods made by the same manufacturer. Indussa Corp. v. United States, 47 CCPA 93, C.A.D. 736 (1960). On the basis of the evidence presented here it would seem that the personalized nature of the individual customer's designs which are imprinted on the wrapping papers precludes the existence of *identical*, and *hence, such* merchandise within the meaning of section 1402(c). Neither party argues for the existence of *such* merchandise in this case. Most of the arguments advanced in the briefs are directed at the question of whether the wrapping papers offered for sale by Cat-Neparofa in the home market are *similar* to the imported paper here involved.

The matter of similarity of imported merchandise with a comparable product sold for home consumption in the foreign market has been the subject of much litigation both in this court and in the Court of Customs and Patent Appeals. In United States v. Irving Massin & Bros., 16 Ct.Cust.App. 19, T.D. 42714 (1928), the Court of Customs Appeals construed the word "similar" as it is used in section 1402(c) [section 402(b) of the 1922 Tariff Act], as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402(b).

And the court went on to say in that case:

The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402(b), the foreign value provision.

Application of the tests laid down in *Massin* in determining "similarity" for tariff purposes led the court in that case to hold that imported silk hatters' plush, quality No. 2522, used for making blocked and men's silk hats, was not similar to silk hatters' plush, quality No. 5400, sold in the German home market and used for general millinery purposes in draping ladies' trimmed, loose hats, where the evidence showed that the two classes of goods were not interchangeable.

And the test of commercial interchangeability was applied in later decisions of our appellate court involving the question of similarity for appraisement purposes of imported merchandise with comparable merchandise in the foreign market. See United States v. Wecker & Co., 16 Ct.Cust.App. 220, T.D. 42837 (1928), involving imported cotton velveteens of various qualities found not to be similar to other cotton velveteens of

various qualities offered for sale in the German home market because they were not made of approximately the same materials or commercially interchangeable; Scharf Bros. Co. (Inc.) v. United States, 16 Ct.Cust.App. 347, T.D. 43089 (1928), involving imported rock candy sticks held to be similar to a rock candy made in Holland and used for the same purpose and commercially interchangeable, although one was larger and more regular in form; Meadows, Wye & Co. (Inc.) et al. v. United States, 17 CCPA 36, T.D. 43324 (1929), involving imported flannels known as "Viyella," "Clydella," and "Ramada," wherein a claim of similarity to other English made cloths said to be "the nearest approximation" of or "the nearest they had to" [the imported merchandise] was made and rejected as not evidencing a similarity of material, use and commercial interchangeability; United States v. F. Vietor & Achelis, 17 CCPA 412, T.D. 43864 (1930), involving imported black velvet ribbons, quality No. 90, held to be dissimilar to a black velvet ribbon, quality No. 9, sold in the German home market, upon a finding that the two qualities of goods were not made of approximately the same materials and were not commercially interchangeable; and United States v. Kraft Phenix Cheese Corp. et al., 26 CCPA 224, C.A.D. 21 (1938), involving imported Roquefort cheese of the "portion" variety found to be dissimilar to foreign home market Roquefort cheese of the "standard" type although made of the same materials, because made by different methods and not adaptable to the same specific uses.

Equality in value and similarity in cost of production are also factors which our appellate court has considered in determining the issue of similarity between imported merchandise and a comparable product sold and offered for sale for home consumption in the foreign market. United States v. Thomas & Co. (Dehler-Signoret Corp.) 21 CCPA 254, T.D. 46788 (1933). The Thomas case involved paper tubes and bobbins of textile machines imported from Czechoslovakia which were held to be similar to other tubes and bobbins offered for sale in the home market despite differences in taper and corrugations not materially affecting cost of production and pricing. And some, though not all of the tubes and bobbins in the home market were said to be interchangeable with and used for the same purposes as the imported merchandise. However, the majority opinion in Thomas seems to have been directed toward that portion of the imported merchandise which was not interchangeable with foreign market merchandise. The court there said (page 259):

> * * * Whether goods sold in the foreign market are similar to those imported cannot always depend upon whether the foreign goods would be accepted as a compliance with an order by the user of the imported goods. That test might require that the goods be identical and the requirement of the statute is only that the goods be similar. Certainly the equality in value and similarity in cost of production, under the circumstances of this case, were very pertinent and material considerations in determining similarity.

The decision of our appellate court in the Thomas case led this court, sitting as an appellate court in Jordan Marsh Co. v. United States, 22 Cust.Ct. 396, Reap.Dec. 7662 (1949), to sustain the export value found by the reappraising trial court for crested table linens imported from Ireland and bearing the personal interwoven crest of the ultimate consumer, the Baltimore & Ohio Railroad Co. The plaintiff-importer in that case, contending for cost of production value, argued that the linens used by the appraiser in finding export value were not "similar" for the reason that linens bearing the interwoven crest of other railroads, or of hotels, or merely a floral crest, could not become commercially interchangeable with linens bearing the personal crest of the Baltimore & Ohio Railroad. The Government in that case contended that com-

mercial interchangeability was not an essential element of similarity. And the court in *Marsh*, in commenting upon the holding in the *Thomas* case in its decision, said (pages 400–401):

It seems fairly clear in the *Thomas* case, *supra*, the appellate court, in determining whether or not goods are "similar," is inclined to disregard the test of commercial interchangeability in the event goods are made of approximately the same materials, adapted to substantially the same uses, and possess an equality in value and similarity in cost of production. In other words, the doctrine of commercial interchangeability was there held not to be an indispensable element in determining whether or not articles were "similar" for appraisement purposes

\* \* \*.

To the same effect as the decision in the *Marsh* case is the decision of this court, again sitting as an appellate court, in United States v. Frank P. Dow Co., Inc., and Frank P. Dow Co., Inc. v. United States, 25 Cust.Ct. 463, Reap.Dec. 7915 (1950), and sustaining upon the authority of the *Thomas* case a finding of the reappraising trial court of an export value basis of appraisement for imported special quality portraits of certain persons on the basis of comparative special quality portraits of different persons in the foreign export market regarded by the court as being "similar".

The holding in the *Thomas* case was also discussed by our appellate court in its later decision in H. J. Heinz Company v. United States, 43 CCPA 128, C. A.D. 619 (1956), which rejected a cost of production basis of appraisement and substituted a foreign value basis of appraisement for imported Heinz tomato pulp that had been compared by the lower courts and by the appraiser with an English home market tomato pulp and regarded by these judicial and administrative authorities as being "dissimilar" because lacking in mutual interchangeabil-

ity according to the evidence at hand. Of the *Thomas* case the court said (page 135):

\* \* \* In United States v. Thomas & Co., *supra*, we held that certain imported bobbins were "similar" to bobbins sold in the country of exportation notwithstanding that their differences in structure did not render them interchangeable. The criterion of "commercial interchangeability" which was set forth in the *Massin* case, *supra*, has obviously been enlarged in subsequent decisions of our court, and we can see no reason for not doing so here in meeting the facts of this case.

But in United States v. Oscar E. Eggen (American Express Co.) et al., 55 CCPA 95, C.A.D. 939 (1968), involving a comparison between imported "inch" size ball bearings with "metric" size ball bearings sold in the German home market and considered by our appellate court and the lower courts to be "dissimilar" bacause lacking mechanical and commercial interchangeability, that court reassessed the facts in the *Thomas* case (without considering its reassessment of those facts as announced in *Heinz*) and distinguished the *Thomas* case from the *Eggen* case on factual grounds. The court said of *Thomas* (page 99):

We think the fact that *some* of the imported and home market articles were interchangeable and that there was no difference in commercial value in *Thomas*, results in a clear distinction between it and the present case \* \* \*.

■ Thus, while the decision of our appellate court in the *Eggen* case, which carries the latest expression of opinion of that court on the test of commercial interchangeability, did not overrule its prior decision as to commercial interchangeability rendered in the *Thomas* case, the effect of the decision in *Eggen*, and the prognosis stemming from *Eggen*, is that the application of the principle laid down by our appellate court in the *Thomas*

case will be limited to cases where there is clearly only partial non-interchangeability as between imported merchandise and foreign market merchandise with which it is compared for appraisement purposes. Consequently, while this court may regard the decision in *Marsh*, which follows the holding in the *Thomas* case (and which case the court finds to be more analogous to the facts of the case at bar than any other, including those cited in the briefs of counsel), to be good law, it would appear, in the light of the decision of appellate court in *Eggen*, that the better test of similarity to apply to the facts of this case is the test enunciated in the *Massin* case.

■■■■ As the court views the evidence in the case at bar there can be no question but that the candy wrapping paper offered to plaintiff by Cats-Neparofa is made of the same materials and is adapted to the same use as that which Cats-Neparofa offers for sale in the home market. And so, it comes down to a question of commercial interchangeability—the sole remaining criterion for determining "similarity" for appraisement purposes as laid down in *Massin*. Is the merchandise *offered* to plaintiff by Cats-Neparofa commercially interchangeable with the merchandise that Cats-Neparofa *offers* to customers in the home market? The court is of the opinion that it is.

The merchandise in question is manufactured by Cats-Neparofa upon orders received from customers, be they American or Dutch. And it is clear that within the proffered range of specifications as to paper foil printing and color the manufacturer offers the same product to each customer, whether American or Dutch— namely, candy wrapping paper imprinted with the personal design and name of the candy manufacturer to whom the offer is made. It is true, of course, that the end product resulting from the fabrication processes will be different to the extent that the personal design and name of each candy manufacturer is different. However, upon acceptance by the paper

manufacturer of any two or more orders from customers utilizing the same specifications referred to, any of the materials of manufacture to which the paper manufacturer has access can be allocated to the fulfillment of the contracts thus made without reference to the individual identity of each customer. This, in the court's opinion, is commercial interchangeability within the meaning of the *Massin* case as applied to the facts of the instant case where the product offered is personal though not unique in its nature. As is pointed out by Government counsel in the brief, a particular design and insignia have nothing to do with the interchangeability or commercial value of the paper. And as the record indicates the individual candy manufacturer's design does not enter into the pricing structure of the candy wrapping paper.

It is to be noted that the court in *Massin* said of the predecessor statute to section 1402(c) that "the dutiable value of the imported goods shall be fixed at the market value or price of * * * similar goods *offered* for sale abroad." [Emphasis added.] Consequently, it is in such posture that the concept of commercial interchangeability must find application for appraisement purposes. And it is not to be supposed that the existence of commercial interchangeability thus established in terms of what is *offered* for sale abroad, can be defeated by means of a *resulting end product* possessing a few changes in structure, a new name, and being restricted in sale to and use by the purchaser. United States v. Irving Massin & Bros., *supra*, 16 Cust.Ct.App. at page 25.

It follows from the foregoing, and the court concludes that the merchandise at bar is "similar" to the merchandise offered for sale by Cats-Neparofa in Holland for home consumption. Since plaintiff has not challenged the prices of this merchandise in the home market, which it appears are higher than the prices for exportation to the United States, the

court finds that foreign value as appraised is the proper dutiable value for the merchandise at bar. As such, it is unnecessary for the court to consider the alternative, residual basis of valuation contended for here by plaintiff.

On this record, the court finds as facts:

1. That the merchandise herein consists of metal foil covered paper for wrapping candy which was manufactured in and exported from Holland by Cats-Neparofa on or about November 26, 1965.

2. That said merchandise was appraised upon entry on the basis of foreign value as defined in 19 U.S.C.A., section 1402(c) (section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at Dutch florins 5351.30 per 2000 pounds net, plus the cost of export packing in the amount of $122 U. S. dollars.

3. That at or about the date of exportation of said merchandise, similar merchandise was freely offered for sale for home consumption to all purchasers in the principal markets of Holland in the usual wholesale quantities and in the ordinary course of trade at prices which were higher than the prices at which said merchandise was offered for sale for exportation to the United States.

And on the basis of said facts, the court concludes as matters of law:

1. That the evidence of record does not rebut the presumption of correctness attaching to the appraised value.

2. That foreign value as defined in 19 U.S.C.A., section 1402(c) (section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the merchandise covered by the reappraisement appeal herein.

3. That such foreign value is represented herein by the appraised value.

Judgment will be entered accordingly.