**GEORG MULLER OF AMERICA, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 81–04–00440.**

United States Court of
International Trade.

Nov. 21, 1989.

Mandel and Grunfeld (Steven P. Florsheim, on the briefs and at trial; and Robert B. Silverman, New York City, of counsel), for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City, Al J. Daniel, Jr., for defendant.

## MEMORANDUM OPINION AND ORDER

RE, Chief Judge:

The question presented in this case pertains to the proper appraisement or valuation, for customs duty purposes, of certain ball bearings, imported from the Federal Republic of Germany between 1975 and 1980. The imported ball bearings consisted of those measured in the metric system (metric) and those measured in the United States system (inch).

The Customs Service appraised the metric bearings on the basis of "foreign value." The inch bearings were appraised on the basis of "cost of production" at the invoice unit values plus an 11 per centum surcharge. The appraisals were made pursuant to section 402a of the Tariff Act of 1930 as amended by section 2(a) of the Customs Simplification Act of 1956, codified at 19 U.S.C. § 1402 (1976) (repealed 1979).

Plaintiff, Georg Muller of America, Inc., protests the appraisement of the imported bearings, and contends that both the metric and inch bearings should properly be appraised on the basis of "cost of production"

at the invoice unit values. Defendant contends that the ball bearings were appraised correctly, and that plaintiff has failed to rebut the statutory presumption of correctness which attaches to the government's appraisement of the imported merchandise.

As to the metric bearings, the question presented is whether the Customs Service properly appraised the merchandise on the basis of "foreign value," or whether the bearings should have been appraised on the basis of "cost of production" at the invoice unit values, as contended by plaintiff. As to the inch bearings, the question presented is whether the Customs Service properly determined the "cost of production" at the invoice unit values plus an 11 per centum surcharge, or whether the invoice unit values represent the correct "cost of production," as contended by plaintiff.

After careful examination of the evidence adduced at trial, the contentions of the parties, the pertinent statutory provisions and the relevant case law, it is the determination of the court that plaintiff has not overcome the presumption of correctness which attaches to the government's determination of dutiable value. *See* 28 U.S.C. § 2639(a)(1) (1982); *Jimlar Corp. v. United States*, 11 CIT 501, 670 F.Supp. 1001 (1987). Accordingly, the valuation of the imported merchandise by Customs is affirmed.

## BACKGROUND

This litigation arises out of an investigation, requested in 1972 by the United States Customs Service at the Port of Los Angeles, because there had been no significant price increases for ball bearings manufactured by Georg Muller Kugellagerfabrik KG Nürnberg (GMN) in the preceding fifteen years. Pursuant to the request, the Customs Representative in the Federal Republic of Germany initiated a "foreign value" investigation of GMN to assist Customs in correctly appraising the bearings at issue. The results of this investigation are contained in three separate reports that were issued in 1974, 1976, and 1977. Customs made its appraisement of the ball bearings on the basis of these findings.

The entries in this case involve bearings manufactured by GMN and by other manufacturers, and imported by plaintiff, the wholly owned American subsidiary of GMN.

This case originally consisted of 9 protests, containing a total of 12 entries. At trial, however, plaintiff moved to dismiss with respect to entry number 200096, because the relevant entry documents had been misplaced. The motion to dismiss was granted, and 11 entries remain.

Since "ball bearings" are on the "final list" determined by the Secretary of the Treasury pursuant to section 6(a) of the Customs Simplification Act of 1956, the appraisement of the imported merchandise is governed by section 402a of the Tariff Act of 1930, as amended by section 2(a) of the Customs Simplification Act of 1956. *See* 93 Treas.Dec. 14, 32, T.D. 54521 (1958).

In relevant part, the statute provides that imported merchandise contained on the "final list" of the Secretary of the Treasury is appraised on the basis of:

(1) The foreign value or the export value, whichever is higher;

(2) If the appropriate customs officer determinates that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appropriate customs officer determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production....

19 U.S.C. § 1402(a) (1976) (repealed 1979). It is well settled that "each of the bases of valuation contained in section 402[a of the Tariff Act of 1930], contemplates a single price as determinative of value thereunder, and ... where there is no single, uniform price at which merchandise is freely offered for sale to all purchasers under one of the said valuation bases, no finding of value upon such basis can be made." *A. Newberg & Co. v. United States*, 41 Cust.Ct. 612, 617, A.R.D. 92 (1958).

## THE METRIC BEARINGS

Plaintiff contends that the imported metric bearings were wrongly appraised by Customs on the basis of "foreign value," and asserts that they should be appraised on the basis of "cost of production" at the invoice unit values. In its brief, plaintiff asserts that "[t]he Foreign Value basis of appraisement is inapplicable to the subject metric sized ball bearings because sales of said merchandise in the home market were restricted, and because there were no uniform prices for the bearings." Plaintiff also argues that the United States value basis does not apply because "all sales of metric sized German ball bearings in the United States were made at non-uniform prices, or were restricted."

Under the statute, the "foreign value" of imported merchandise is defined as:

the market value or the price at the time of exportation of such merchandise to the United States, *at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade,* including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

19 U.S.C. § 1402(c) (1976) (repealed 1979) (emphasis added). It is clear that the statutory definition of "foreign value" contemplates imported merchandise "freely offered for sale" at the home markets. Hence, if imported merchandise is not "freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported," it cannot be appraised on the basis of "foreign value." *Id.; see United States v. Mexican Prods. Co.,* 28 CCPA 80, 89–90, C.A.D. 129 (1940).

In support of its contention that the metric ball bearings were not freely offered for sale or sold in the Federal Republic of Germany, plaintiff presented the testimony of Mr. Jurgen Beier, who is GMN's sales manager for ball bearings. From 1969 to 1978, Mr. Beier was in charge of GMN's sales offices in Bielerfeld. From 1978 to 1983, he was responsible for all of GMN's domestic sales. Mr. Beier testified that he was familiar with the sale of ball bearings in the Federal Republic of Germany, from 1975 to 1980, by GMN and its competitors.

Mr. Beier testified that the vast majority of ball bearings sold by GMN in the German market, from 1975 to 1980, were metric measured bearings. He stated that GMN sold ball bearings in Germany to original equipment manufacturers (OEMs) and distributors with annual purchases of 30,000 Deutsche Marks (DM) or more. He stated that customers who purchased less than 30,000 DM per year dealt either with GMN's "sister" company, Walzlager Vertriebs–GmbH (WALAG), or with one of the five or six other distributors that GMN used between 1975 and 1980.

Mr. Beier explained that the distributors sold bearings "to smaller customers like repair shops that needed ball bearings and even to still smaller ones that were not distributing them but selling them directly...." He stated that the distributors "entered an agreement with [GMN] for a given territory." According to Mr. Beier, "[e]ach distributor was assigned a section of the map of the Federal Republic of Germany."

Mr. Beier specifically denied that "two different OEM customers purchasing an identical bearing, in approximately the same quantities, ... would ... always get the same price[.]" Mr. Beier supplied an example:

In Germany, we have certain areas of industrial concentration where there is *more competition in every respect.* Let's take Stuttgart, for instance, where there is more industry that uses ball bearings than there is in Berlin, and it is quite possible that a customer in Stuttgart can get the same quantity and the same type of ball bearings in the same execution than one somewhere else, and pay less for it.

He stated that, in addition, the German distributors did not pay uniform prices

when purchasing bearings from GMN. He noted that the prices for the distributors were set by "the same system that [was used for the OEMs]."

On cross examination, Mr. Beier was questioned about the territorial restrictions on sales by GMN's German distributors. He was asked what would happen "[i]f a purchaser in Frankfurt came directly to you in Nuernberg and said—I want to buy 20,000 Deutsch Marks of bearings of a certain specification...." He replied that "I would kindly ask him to turn to our distributor in Frankfurt." Mr. Beier stated that even if the customer insisted that he did not want to deal with the local distributor, "[t]hen I would have to tell him—we are a public company. We have a written contract with our distributor in Frankfurt and unfortunately, I cannot do differently." Mr. Beier also stated that only two other German companies, FAG Kugelfischer Georg Schafer (FAG) and SKF GmbH (SKF), manufactured ball bearings, in significant amounts, during the time of importation.

If imported merchandise is not "freely offered for sale" within the meaning of section 1402(c), the "foreign value" of the imported merchandise may be determined on the basis of the "foreign value" of similar merchandise. *See Nichols & Co. v. United States*, 59 CCPA 67, 71, C.A.D. 1041, 454 F.2d 1183, 1187 (1972). Mr. Beier testified that both FAG and SKF had a distribution system in Germany that, like GMN's, involved distributors with territorial restrictions. According to Mr. Beier:

> That is quite the usual and common way of doing business in Germany. FAG and SKF are using precisely the same method. The SKF dealer in Munich cannot start selling in Hamburg. That is quite common in Germany in all trade—not only in ball bearings—to use such limitations for sales.

Mr. Beier was questioned about certain price lists of ball bearings, published by GMN during the time of importation. He explained that "[w]e printed this type of list, actually, only because SKF and FAG also have lists like that." He added that

"this price list was only a kind of guideline. We have never really used this list for enforcement."

In support of its contention that the evidence in this case establishes that the metric bearings and "similar merchandise" are not "freely offered for sale" in Germany within the meaning of section 1402(c), plaintiff cites *Hensel, Bruckmann & Lorbacher, Inc. v. United States*, 5 CIT 262, 569 F.Supp. 849 (1983), *aff'd*, 735 F.2d 1340 (Fed.Cir.1984). In *Hensel, Bruckmann*, the imported merchandise consisted of industrial sewing machine needles manufactured by Ferd. Schmetz, GmbH (Schmetz), and imported from the Federal Republic of Germany. Customs appraised the merchandise, which was on the "final list" of the Secretary of the Treasury, on the basis of "foreign value" under section 1402. Plaintiff contested the appraisement and contended that, at the prices used by Customs in the appraisement, the merchandise was "not freely offered to all purchasers in West Germany in the usual wholesale quantities as there were restrictions on the sales made at these prices...." 5 CIT at 263, 569 F.Supp. at 850–51.

This court in *Hensel, Bruckmann* concluded "that all of the sales of the merchandise in the home market in the usual wholesale quantities are restricted for the period under consideration, [and] there is no foreign value for the merchandise." 5 CIT at 264, 569 F.Supp. at 851. In determining the "foreign value" of "similar merchandise," the court next considered the sales practices, during the time of importation, of the only other German manufacturers of industrial sewing machine needles, the Singer Company and Leo Lammertz Nadelfabrik (Lammertz).

The parties "agreed that the Singer Company did not freely offer similar merchandise for sale in West Germany during the relevant period of time...." *Id.* at 264, 569 F.Supp. at 852. As to Lammertz, plaintiff's evidence "establish[ed] that Lammertz utilized a network of dealers similar to that employed by Schmetz and that these dealers were controlled by Lammertz in much the same way that Schmetz con-

trolled its dealers, that is, restrictions as to sales territories and resale prices." *Id.* at 265, 569 F.Supp. at 852. On the facts found, the court held that "foreign value" for "such or similar merchandise" did not exist, and concluded "that both Schmetz and Lammertz controlled the territorial dealers as to resale prices, geographical areas of distribution and other matters...." *Id.* Hence, on appeal, the decision of the Court of International Trade was affirmed. *See Hensel, Bruckmann,* 735 F.2d 1340.

In contrast to the evidence of the manufacturers' restrictions on the resale prices established by their distributors in *Hensel, Bruckmann,* plaintiff's evidence in this case only described territorial restrictions on GMN's distributors. Plaintiff has neither alleged nor proven that GMN established the prices at which its distributors resold its bearings. The present case, therefore, is clearly distinguishable from *Hensel, Bruckmann.*

As to the metric bearings, plaintiff also asserts that, because "such or similar merchandise" is not "freely offered for sale for domestic consumption," the metric bearings cannot be appraised on the basis of "United States value." *See* 19 U.S.C. § 1402(e) (1976) (repealed 1979). In support of its contention, plaintiff presented the testimony of Mr. Charles Mueller, its president, and Mr. Michael Kelly, a former factory representative of SKF's American subsidiary. In essence, both Mr. Mueller and Mr. Kelly testified that the sale of bearings in the United States, by both plaintiff and its competitors, involved negotiated prices and restrictive distribution systems. Clearly, however, "it is incumbent upon plaintiff to eliminate the existence of a foreign value for the merchandise at bar before undertaking to establish another value therefor." *E.J. Brach & Sons v. United States,* 65 Cust.Ct. 718, 723, R.D. 11721, 317 F.Supp. 264, 268 (1970) (citing 19 U.S.C. § 1402(a) (1976) (repealed 1979)).

It is important to note that the testimony of plaintiff's witnesses pertained to sales practices of GMN which occurred between 1975 and 1980. The testimony, which described events that occurred at least 8 years before the trial, was not supported by any documentation. Plaintiff has not introduced any letters, memoranda, or other correspondence pertaining to GMN's sales practices. Even as to the territorial restrictions on sales of GMN's bearings, plaintiff has not presented copies of GMN's written contracts with its German distributors. Furthermore, even if the court were to conclude that plaintiff's evidence conclusively establishes that the sales practices of GMN's dealers in Germany were limited by territorial restrictions, there is no evidence that GMN controlled the prices at which its dealers resold the bearings, or otherwise restricted resale by the dealers.

Defendant does not only rely on the statutory presumption of correctness, but also introduced evidence in support of its contention that the imported metric bearings were properly appraised on the basis of "foreign value." In support of its contention, defendant presented the testimony of Mr. Ivan Taborsky, the Customs Service representative in Frankfurt, Germany from 1972 to 1977. Mr. Taborsky conducted the "foreign value" investigation of GMN. He testified that during his investigation of GMN he met with Mr. Dietrich Berger, GMN's export manager, "in the neighborhood of 15 to 20 times, at least."

> Mr. Taborsky stated that:
> as part of the investigation on foreign value, we have to determine whether or not there is a restricted market. So I would go ask a series of questions regarding restrictions, and if someone tells me that there are restrictions, then I have to go verify it.

He testified that he had "ask[ed] [GMN] whether they had any restrictions on sales in their home market[.]" Mr. Taborsky specifically denied that "anyone at GMN ever indicate[d] to [him] that they had restrictive contracts with any of th[eir] distributors[.]"

Mr. Taborsky explained that, during the GMN investigation, "[t]here was nothing said about written agreements or contracts." He testified that GMN described their sales practices in Germany as involv-

ing "a series of agents or representatives ... who would go out and solicit sales." He stated that "[t]hey said they had certain marketing practices which they liked to promote in a certain structure, but as far as absolute restrictions, no." According to Mr. Taborsky, GMN "would have liked to have kept things within assigned territories[,] [but] [w]hen it came right down to it, they had no real control over it."

Mr. Taborsky further testified that he had conducted similar investigations of other German manufacturers of ball bearings. He explained that FAG had sales agents or representatives in Germany who "were assigned specific territories in which to sell, and they were under ... written contract, to stay within those territories." Mr. Taborsky stated that he had asked FAG "to see [copies of these contracts] and I was shown them."

Defendant also elicited testimony from Mr. Taborsky pertaining to GMN's price lists. Mr. Taborsky testified that GMN would issue price lists for the home market sales. These were gross prices. In other words, prices that anybody could buy off of. And from those prices, they would offer varying discounts, depending upon the customer.

He stated that he "requested and did obtain copies of various price lists covering different periods of time."

Mr. Taborsky testified about his attempts to verify the information contained on the GMN price lists. He stated that "what I discovered when I went to verify the record on home market sales was that there was no ... complete record by customer." He explained that "with respect to the records for specific customers in the home market, they had customer cards." Mr. Taborsky stated that the customer cards "contained ... an identification of the particular purchaser, usually indicating either specific bearings or type of bearings that this purchaser was buying, and would also indicate a discount rate."

Mr. Taborsky's testimony indicates that his investigation was hindered by GMN's reluctance to release documents or information concerning restrictions on its dis-

tributors. Under these circumstances, it cannot be disputed that Customs' decision to appraise the merchandise on the basis of "foreign value," as a result of Mr. Taborsky's investigation, was founded on "reasonable ways and means...." 19 U.S.C. § 1500(a) (1988). Indeed, in appraising the merchandise, Customs officials had "the right and duty to use their own judgment and knowledge in connection with such evidence as is before them in making the appraisement." *General Commercial Co. v. United States*, 11 CCPA 473, 474–75, T.D. 39538 (1923). Hence, from a careful review of the testimony, it is evident that plaintiff has failed to rebut defendant's statutory presumption of correctness as to the appraisement of the metric bearings.

### THE INCH BEARINGS

As for the inch bearings, the parties agree that the merchandise is properly appraised on the basis of "cost of production." Plaintiff, however, objects to the values determined by Customs, and contends that "[t]he correct Cost of Production values for the inch sized bearings, in accordance with the evidence adduced at trial, are the invoice unit values...." Plaintiff asserts that the correct "cost of production" values for the inch bearings manufactured by GMN is contained in the cost calculation sheets introduced by plaintiff at trial. For the imported inch bearings not manufactured by GMN, plaintiff asserts that "GMN's acquisition costs ... can be accepted as the Cost of Production amounts for materials and fabrication costs, general expenses, and packing costs."

The statute provides that:

For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the partic-

ular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

19 U.S.C. § 1402(f) (1976) (repealed 1979).

Plaintiff presented the testimony of Mr. Gerd Edelhauser, who, at the time of the importations, was the assistant to the head of GMN's cost accounting department. Mr. Edelhauser had full responsibility for determining the cost of the bearings manufactured by GMN. Plaintiff introduced into evidence cost calculation sheets for each type of GMN manufactured ball bearing in the entries in this case. According to Mr. Edelhauser, the cost calculation sheets were either prepared by him or under his supervision.

The cost sheets divided the manufacture of each type of ball bearing into the manufacture of the bearing's components, and listed figures for the various kinds of costs that go into each component. Mr. Edelhauser testified that for each part of the ball bearing his department obtained the costs of the raw material, "material overhead," labor, "production overhead," and administrative and sales costs (including "management, sales department, travel costs, costs at trade fares, promotion, advertising, packaging, package material[,] [h]eat, electricity, ... [b]ookkeeping...."). The cost

sheets also included a "[c]alculatory profit," of fifteen per centum.

Mr. Edelhauser testified that the cost calculation sheets contain the "[a]ctual costs" of the manufacturing process. He explained that the purchasing department supplied the cost accounting department with the figures for the raw material, the amount of material used, and the time of manufacture. According to Mr. Edelhauser, all other calculations on the cost calculation sheets "are ... gathered in my own department and are worked with and calculated [there]." He testified that the cost calculation sheets were audited annually by an independent auditing firm, and stated that the process used to determine the costs of the bearings "follow[ed] general accounting procedures in the Federal Republic of Germany, during [the time of importation.]"

On cross examination, Mr. Edelhauser was questioned about the preparation of the cost calculation sheets. He admitted that the invoices for materials purchased by GMN are not maintained by his department. He also admitted that, in measuring the time needed for the manufacture of the ball bearings, he "rel[ies] on the accuracy of the information given [him] by the technical staff[.]"

Mr. Edelhauser was asked about a specific cost identified on the cost calculation sheets as "Sonderkosten des Vertriebs." He explained that this amount "really does not stand for anything. It simply expresses the wish that we could still ... recover some costs there. It does not have anything to do with the actual calculations...."

Plaintiff also presented the testimony of Mr. Dietrich Berger, who was GMN's export manager during the time of importation. Mr. Berger identified, on the entry sheets, the imported bearings which were not manufactured by GMN but were purchased from other manufacturers. He testified that the costs of these bearings were available from manufacturers' price lists and order sheets obtained by his department.

Defendant's witness, Mr. Ivan Taborsky, testified that, in the course of conducting

his investigation of GMN, he sought "to develop cost of production information." He stated that Mr. Berger allowed him "to look at a couple of cost of production sheets similar to those that have ... been [introduced at trial]." He added, however, that GMN officials "advised me that these were highly confidential internal documents and they were very reluctant to release them outside the company." Mr. Taborsky explained that, when he asked for copies of the cost calculation sheets, the GMN officials "said they would prefer not to give [them] to me, and I was not insistent."

Mr. Taborsky stated that he attempted to verify the cost figures contained on the cost calculation sheets, but that "it was difficult to substantiate [the cost calculation figures] from their records." He explained that GMN's records "didn't go down to sufficient detail." He also contradicted Mr. Berger's testimony that the figures on the cost calculation sheets represented actual costs. Mr. Taborsky stated that, in contrast, he had determined that the figures represented "standard costs." He explained that "when you go into standards, standards are usually based on a certain utilization of plant capacity, and that can fluctuate from time to time. It would have a pretty drastic effect on the calculations." Mr. Taborsky also testified that GMN did not provide him with actual profit figures, and that "the only thing they provided me with was some overall figures on profit by year."

Defendant also presented the testimony of Mr. Paul Zarocostas, a senior import specialist with the Customs Service who was responsible for the appraisement of the imported inch ball bearings in issue. Mr. Zarocostas stated that he "had to analyze the report that came from Mr. Taborsky to establish a basis of appraisement[,]" and he concluded that the proper basis for the appraisement of the inch bearings was the "cost of production."

In the course of his analysis, Mr. Zarocostas compared the "cost of production" figures compiled by Mr. Taborsky for the R4ZZ bearings with the corresponding invoice unit values. He testified that "[Mr. Taborsky's] report showed that the cost of production of the bearing was actually more than was shown on the invoices, and I had to make an adjustment to bring the appraisement into line with the statutory minimum of 8% profit." He explained his determination that an 11 per centum addition was necessary to the invoice unit values, in order to account for the statutory profit, because an 11 per centum addition to the R4ZZ bearing invoice unit values resulted in an 8 per centum profit for that bearing. Mr. Zarocostas stated that he used the R4ZZ bearing as representative of all the imported inch bearings, because it "was the one most frequently imported and was also the one that was ... verif[ied] against the cost sheets." He explained that "[t]he information was very limited[,]" and the cost figures for the R4ZZ were the only figures that had been verified.

The cost of production of the inch bearings is determined by adding the cost of the materials and manufacture, the "usual general expenses," the cost of containers, and the statutory minimum 8 per centum profit. *See* 19 U.S.C. § 1402(f) (1976) (repealed 1979). Defendant maintains that, "[i]n the absence of more specific information as to GMN's costs of production at the time of appraisement, ..." its 11 per centum addition to the invoice unit values is proper.

In *Andy Mohan, Inc. v. United States,* 74 Cust.Ct. 105, C.D. 4593, 396 F.Supp. 1280 (1975), *aff'd,* 63 CCPA 104, C.A.D. 1173, 537 F.2d 516 (1976), the imported merchandise consisted of various pieces of men's clothing. The merchandise was appraised by the Customs Service on the basis of "constructed value," under section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Plaintiff agreed that the imported merchandise should be appraised on the basis of "constructed value," but asserted "that a lesser constructed value ... should have been returned by the appraising officer...." 74 Cust.Ct. at 106, 396 F.Supp. at 1281.

In *Andy Mohan,* the Customs Court indicated that "[i]n value cases, particularly where cost of production ... or constructed value is in issue, the evidence offered by

1354

the parties, especially the cost records and related documents, has always been subject to careful scrutiny by the court." 74 Cust.Ct. at 112, 396 F.Supp. at 1286. In sustaining the appraisement by Customs, the Court held that, since the record failed "to meet the evidentiary standard of proof required by the applicable judicial authorities[,]" plaintiff had failed to rebut the presumption of correctness. *Id.* at 114, 396 F.Supp. at 1288. In affirming the decision of the Customs Court, the Court of Customs and Patent Appeals observed that "[e]vidence should be assessed 'in practical terms, considering such factors as completeness, adequacy of bases, and possible motives to deceive,'...." 63 CCPA at 107, 537 F.2d at 518 (citing *Mannesmann–Meer, Inc. v. United States,* 58 CCPA 6, 8, C.A.D. 995, 433 F.2d 829, 831 (1970)).

In this case, from a careful consideration of the testimony and a close reading of the cost calculation sheets, it is evident that plaintiff has failed to rebut the presumption of correctness that attaches to Customs' appraisement of the inch bearings. The cost figures used in GMN's cost calculation sheets were not supported by either documentary evidence or specific testimony. Plaintiff did not present invoices setting forth the prices paid by GMN for raw materials or other costs, nor did Mr. Edelhauser, in his testimony, describe the accumulation of the cost figures by his department. Although he stated that most of the cost figures were "gathered in my own department," he did not indicate or explain how his department determined those figures. Moreover, according to Mr. Edelhauser's own testimony, the final cost factor, "Sonderkosten des Vertriebs," "really does not stand for anything," and is "pure nonsense."

The testimony of Mr. Taborsky also raises doubts about the reliability of GMN's cost calculation sheets. According to Mr. Taborsky's investigation, the cost figures used by GMN represented "standard," or estimated, costs. Mr. Taborsky also testified that he was never given actual profit figures by GMN.

Section 1500(a) of title 19 directs "the appropriate customs officer" to "appraise merchandise by ascertaining or estimating the value thereof ... by all reasonable ways and means in his power, any statement of cost or costs of production in any invoice, affidavit, declaration, other document to the contrary notwithstanding...." 19 U.S.C. § 1500(a) (1988). Since the cost figures for the R4ZZ bearing were the only verified cost figures obtained by Mr. Taborsky, Mr. Zarocostas was justified in using these figures in determining that an 11 per centum surcharge was necessary to establish the correct "cost of production" of the inch bearings. Hence, having considered Mr. Taborsky's investigation, Mr. Zarocostas' determination that an 11 per centum surcharge on the invoice unit values was necessary to provide for the statutory minimum 8 per centum profit, was reasonable and proper.

## CONCLUSION

On the record presented, it is the holding of the court that plaintiff has not overcome the presumption of correctness, and that the metric bearings were properly appraised on the basis of "foreign value," and that the inch bearings were properly appraised on the basis of "cost of production" at the invoice unit values plus an 11 per centum surcharge. Accordingly, Customs' appraisement is sustained, and plaintiff's action is dismissed.